Brian J. Holiday (8931)
Eleutian Legal Dept.
215 2nd St.
Ten Sleep, WY 82442
Phone 307-366-2902
Fax 307-366-2904
brian@eleutian.com

Attorney for Plaintiff Eleutian Technology





# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| ELEUTIAN TECHNOLOGY, LLC, a Wyoming limited liability company, | **MEMORANDUM IN OPPOSITION TO RICHARD SCOTT MOTION TO QUASH AND MOTION FOR A PROTECTIVE ORDER** |
| Plaintiff, | |
| vs. | Case No. 2:08-mc-331-TC |
| GLOBAL EDUCATION TECHNOLOGIES, LLC, a Georgia limited liability company, formerly known as CITO-LT, a Georgia limited liability company; STEVE BRANDAU; LARRY HOWICK; JANIS KOH; and John Does 1-5 | Judge Tena Campbell<br><br>Magistrate Judge Brooke C. Wells |
| Defendants. | |
| GLOBAL EDUCATION TECHNOLOGIES, LLC, a Georgia limited liability company, | |
| Counterclaimant, | |
| vs. | |
| ELEUTIAN TECHNOLOGY, LLC, a Wyoming limited liability company, | |
| Counterclaim Defendant. | |

Plaintiff Eleutian Technology, respectfully submits this Memorandum In Opposition to Mr. Scott's Motion to Quash Subpoena and Motion for Protective Order.

## INTRODUCTION

Surprisingly and unfortunately, it appears Mr. Scott has been less than forthcoming as it relates to his knowledge regarding the events surrounding, and the parties involved in, the Wyoming dispute.  A careful reading of Mr. Scott's Affidavit in regards to what it does not say, coupled with the declarations and documents being submitted with this opposition brief, leads one to conclude that Mr. Scott's deposition in this matter is not an "attempt to harass and annoy" Mr. Scott, but is a sincere desire and need to question Mr. Scott as to his personal and direct knowledge as it relates to matters surrounding the Wyoming dispute.

## FACTS

1. In or about 2005, Richard Scott was instrumental in the establishment of the Center for International Teaching and Outreach ("CITO").  (*See* http://services.byuh.edu/iddgroup/?q=apostolic_beginning).  CITO is a division of Brigham Young University – Hawaii ("BYU-H").  The dean of CITO is Dr. Robert Hayden.

2. In or about the fall of 2005, current Eleutian President Kent Holiday was living and working in Korea.  Mr. Holiday was a corporate executive at KT.  KT is one of the world's largest telecommunications companies with over 40,000 employees and a presence throughout the world.  Mr. Holiday is an American and as such, was the first, and still the only non-Korean to hold a corporate executive position at KT.  Mr. Holiday is also a member of the LDS Church. (Holiday Decl., ¶ 3, attached hereto as Exhibit 1).

3. In the Fall of 2005 Dr. Hayden, along the with assistant dean of CITO, David Wade, contacted Mr. Holiday at KT via telephone and explained to him that he was the Dean of CITO, an entity related to BYU-H, and that CITO was under the direction of Richard Scott. Dr. Hayden then communicated the vision of CITO and asked Mr. Holiday if he would assist CITO in Korea. Mr. Holiday responded that he was not in a position to assist at that time, but would shortly be leaving KT and would be in contact with Dr. Hayden. (Id., ¶ 4).

4. Shortly thereafter, Mr. Holiday did leave KT and in early 2006 founded Eleutian, a Wyoming company which teaches English to Asian students via videoconferencing over the internet using Wyoming teachers. Eleutian has quickly grown to become one of the largest private employers in Wyoming's Big Horn Basin. (Id., ¶ 5).

5. Upon establishing Eleutian, Mr. Holiday contacted Dean David Wade of CITO and discussed ways in which Eleutian could work together with CITO. (Id., ¶ 6).

6. In or about the spring of 2006, BYU-H received rights to license software known as TALL. TALL was created by LDS Church employees at the Missionary Training Center and Brigham Young University. The English Certification Test (ECT) is a component of the TALL product. (Aff. of Richard Scott, ¶ 10, attached hereto as Exhibit 2). CITO was put in charge of administering the TALL products on behalf of BYU-H. (Holiday Decl., ¶ 7).

7. In or about April 2006, Eleutian negotiated and entered into a license agreement with BYU-H ("Agreement"). The Agreement allowed Eleutian to license the ECT software for a twenty (20) year term in return for licensing fees paid to BYU-H. For the first year,

3

Eleutian had rights to offer the ECT to its customers in Korea and Japan; in years 2-20, Eleutian has the rights to offer the ECT to Eleutian customers on a worldwide basis. Eleutian negotiated the Agreement with CITO and Dr. Hayden signed the agreement on behalf of BYU-H. (Id., ¶ 8).

8. Shortly after Eleutian and BYU-H/CITO entered into the Agreement, Eleutian was contacted by Larry Howick, who claimed he was a representative of an entity referred to as CITO-LT. Mr. Howick claimed certain rights and responsibilities relating the Agreement. Mr. Howick and CITO-LT are defendants in the current Wyoming action. (Id., ¶ 9).

9. Within a month of licensing the ECT to Eleutian to sell to Eleutian customers in Korea, CITO-LT negotiated with and sold (allegedly on behalf of BYU-H) an "Exclusive License" to the Korean market. The license purported to license the TALL software, including the ECT, to a new entity, CITO-LT/APAC, on an exclusive basis for the territory of Korea. Ms. Janis Koh, a proprietor of CITO-LT/APAC, is also a defendant in the Wyoming action. (Id. at 10).

10. Eleutian President and CEO Kent Holiday did not understand who CITO-LT was and what role CITO-LT was to play in the Eleutian/BYU-H relationship. In an e-mail sent in September 2006, Mr. Holiday questioned Dr. Hayden[1], dean of CITO, as to who Larry and Steve (CITO-LT proprietors) were. Dr. Hayden responded back that "CITO-LT

---

[1] Eleutian has served Robert Hayden with a subpoena commanding him to appear at deposition in Hawaii to be questioned regarding these matters. Mr Willis Orton, who is also counsel for Dr. Hayden, similarly caused a Motion for a Protective Order be filed in Hawaii for Dr. Hayden's subpoena and as of yet, Eleutian has been unable to depose Dr. Hayden.

(Larry and Steve) was formed at the request of the brethren" (Exhibit A to Declaration of Kent R. Holiday), "brethren" being a term used within the LDS Church signifying a general authority of the LDS Church. (Heaton Depo at 19). A general authority in the LDS Church refers to members of the first presidency, the Quorum of the Twelve Apostles, the first two quorums of the seventies and the Presiding Bishopric. (Heaton Depo. at 19).

11. In a phone call shortly after the "brethren" communication, Kent Holiday communicated that he thought it was odd that general authorities of the LDS Church would be involved in establishing private entities and asked Steve Brandau and Larry Howick which "brethren" were involved in establishment of CITO-LT and what the purpose of CITO-LT was. One of the individuals (Larry or Steve) replied that Richard Scott had requested CITO-LT be established. Eleutian employee Sam Merrill was also included on the call (Holiday Decl., ¶ 12).

12. Indeed, numerous individuals with knowledge of this dispute have all claimed Richard Scott was involved in the decisions relating to the establishment of CITO-LT, BYU-H's licensing of the TALL products, or the eventual licensing and assignments of certain rights to the defendants in the Wyoming action in the fall of 2008 (Id., ¶ 13).

13. Eleutian was unaware at the time of the communications described in paragraphs 10 and 11 that CITO-LT had actually not been established and the company didn't exist (Id., ¶ 14).

14. Eventually, CITO-LT and CITO-LT/APAC, along with their proprietors, began interfering with certain Eleutian contracts and customers in the Korean market. Those

5

communications resulted in Eleutian filing the current Wyoming litigation in August 2007, in which Eleutian requested, among other things, injunctive relief to stop CITO-LT and other defendants from interfering in Eleutian business (Id., ¶ 15).

15. Eleutian immediately made BYU, BYU-H and LDS Church personnel aware of the litigation in August 2007 (Id., ¶16).

16. Subsequent to the Wyoming litigation being filed, Eleutian discovered that BYU-H was itself actually a sub-licensee of the TALL software and that the software was actually owned by Intellectual Reserve, Inc. (IRI), a company which holds the intellectual property of the LDS Church. (Scott Memo at ii.)

17. Subsequent to the filing of the Wyoming litigation requesting an injunction prohibiting CITO-LT's interference with Eleutian business and customers, Brigham Young University (BYU), BYU-H, IRI and Defendant CITO-LT entered into a series of related transactions which would make any injunctive relief imposed by the Wyoming Court moot. Those actions included 1) IRI withdrawing BYU'H's (and thereby Eleutian's) rights to sublicense the ECT; 2) IRI licensing the TALL software exclusively to Defendant CITO-LT (which was then doing business under the name Global Education Technology); and 3) BYU-H allegedly assigning its rights under the Agreement to Defendant CITO-LT. These related transactions occurred in or about October and November of 2007. Mr. Kent Parry, former BYU-Provo employee and TALL Oversight Committee member, told Eleutian President Kent Holiday that these transactions were all done under the supervision of, and approved by Richard Scott (Holiday Decl., ¶ 17).

18. Within days of these transactions being completed, CITO-LT then filed its Answer in the Wyoming litigation, which included a counter-claim based on its newly acquired assignment, claiming Eleutian was somehow in breach of the Agreement (Id., ¶ 18).

19. On May 13, 2008, Mr. Scott, via counsel, was commanded to appear in Salt Lake City, Utah for deposition relating to these matters.

20. On May 20, 2008, Mr. Scott filed a Motion to Quash Subpoena and Motion for a Protective Order.

## ARGUMENT

When seeking this type of relief, the movant has "the burden to show good cause for the requested protective order and adequate reason to quash the subpoena." *Sentry Ins. V. Shivers*, 164 F.R.D. 255, 257 (D.Kan. 1996). As part of this showing, movant has the burden of establishing that compliance with the subpoena would be unreasonable and oppressive. *In re Yassi*, 225 B.R. 478, 484 (Bkrtcy.C.D.Cal. 1998). As enumerated herein, Mr. Scott has failed to satisfy this burden.

The Federal Rules of Civil Procedure provide for broad parameters when conducting discovery. "The rules authorize discovery of all information that is relevant or 'reasonably calculated to lead to the discovery of admissible evidence.' Fed.R.Civ.P. 26(b)(1)." *Mitchell v. Hutchings*, 116 F.R.D. 481, 483 (D.Utah 1987). Expounding on the scope of this rule, courts have uniformly held that discovery should be liberally allowed:

> Relevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party. A request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim or defense of a party.

7

*Transcor, Inc. v. Furney Charters, Inc.*, 212 F.R.D. 588, 591 (D.Kan. 2003) (internal quotations omitted). This broad application stems from innovations in the rules governing pretrial discovery which allow "parties to obtain the fullest possible knowledge of the issues and facts before trial." *Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

These broad discovery principles apply to subpoenas issued pursuant to Fed.R.Civ.P. 45. "It is well settled . . . that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b)." *Transcor, Inc. v. Furney Charters, Inc.*, 212 F.R.D. 588, 591 (D.Kan. 2003); *see also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §2459 (2d ed. 1995) (scope of discovery through a subpoena is "exceedingly broad and incorporates the provisions of Rule 26(b)"). Any individual that is reasonably believed to have discoverable information may thus be subpoenaed pursuant to Rule 45. Even high ranking officials, including the sitting President of the United States of America, are not immune to the Federal Courts' subpoena powers. *See e.g., Clinton v. Jones*, 520 U.S. 681, 691-692 (1997) ("[T]he testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule.").

Because the rules governing discovery are applied liberally to allow broad disclosure of information, it is difficult to limit discovery, especially relevant deposition testimony. Indeed, it has been held that "[t]he quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham International Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005), *citing Rolscreen Co. v. Pella Prod. Of St. Louis, Inc.* 145 F.R.D. 92, 96 (S.D.Iowa 1992) ("Protective orders which totally prohibit the deposition of an individual are rarely granted absent extraordinary circumstances."); *Motsinger v. Flynt*, 119

F.R.D. 373, 378 (M.D.N.C. 1988) ("Absent a strong showing of good cause and extraordinary circumstances, a court should not prohibit altogether the taking of a deposition."). Thus, "the party seeking to quash a subpoena bears a heavy burden of proof." *Irons v. Karceski*, 74 F.3d 1262, 1264 (C.A.D.C. 1995).

The extent of this burden is evident from a review of *Rolscreen, supra* and *Motsinger, supra*. The *Rolscreen* court explains that the party requesting the protective order must make a specific demonstration of facts that support the request as opposed to conclusory or speculative statements that a protective order is needed and that harm will be suffered without one. *Id.* at 96. To this end, the court recognized that when an individual is personally involved in matters relevant to the case, it would be extremely rare that an alleged failure of recollection or averment of no first hand knowledge, would be sufficient to entitle the deponent to an order quashing the deposition. *Id.* at 97, *citing Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 143 (D.Mass 1987). Applying these principles to the facts of the *Rolscreen* case, the court found that it was not too burdensome for the President of a company to be deposed simply because he professed to have no first hand knowledge of anything relevant to the case. The deponent failed to even explain what second hand knowledge he had, and these conclusory statements were not sufficient to carry his burden of showing good cause to quash the deposition. *Id.*

The deponent in *Motsinger* suffered from a congestive heart condition that he alleged made his deposition impossible. He submitted a short letter to the court from a physician stating that because of the deponent's health condition, he should be excused from court appearances for approximately six weeks. The *Motsinger* court stressed that even under these circumstances, only a short stay of the deposition is justified. Any extended stay of the deposition would require

9

detailed information supporting the physician's opinion and may necessitate examination of the physician by the court, and only under the most extraordinary circumstances should the deposition be disallowed altogether. *Id.* at 378.

Now applying these principles to the circumstances of the instant case, it is clear that Mr. Scott has fallen far short of establishing good cause to quash his deposition.

## I. Mr. Scott Played A Role In The Licensing Of TALL By BYU-H.

On May 21, 2008, Eleutian counsel was able to depose Mr. Richard Heaton as to his knowledge as it relates to these matters. Mr. Heaton is the Director of the Missionary Training Center in Provo, Utah (Heaton Depo. at 14) and was the Chairman of the TALL Oversight Committee, a committee established to assist in bringing the TALL product to market (Heaton Depo. at 28, 29). Despite Mr. Scott's sworn statement in paragraph 11 of his Affidavit, namely that "I did not oversee, participate in, or have any involvement with, BYU-H's licensing of TALL, or any component thereof, to any party" (Scott Aff., ¶ 11), and Mr. Scott's claim in paragraph 14 that "I do not have any knowledge of, nor did I have any involvement with, BYU'H's licensing of the ECT to Eleutian, or to BYU-H's licensing to anyone else for that matter," Mr. Heaton tells a much different story. Mr. Heaton, a man who is often in meetings with Richard Scott (Heaton Depo. at 36), claims he was in a meeting with Mr. Scott in which Mr. Scott expressed his desire to see the TALL product developed and Mr. Scott was in support of "whatever would be required to help that happen" (Heaton Depo. at 37). Eventually, a solution was proposed by Mr. Heaton and others in which the TALL product would be licensed to BYU-Hawaii and BYU-Hawaii would in turn license the product to third party, for-profit, entities

10

(Heaton Depo. at 38-40). Mr. Heaton is certain that Mr. Scott was aware that BYU-H was licensing TALL to third party, for profit, entities and claims to have sat in meetings with Mr. Scott in which the licensing by BYU-H of TALL to third parties was discussed (Heaton Depo. at 44 and 45). BYU-H's licensing of the TALL product to third parties, namely Eleutian and CITO-LT/APAC and the individuals allegedly put in charge to license TALL on behalf of BYUH (namely CITO-LT) is at the heart of the Wyoming dispute.

As claimed by Mr. Scott himself, he is a very busy man and is a "high ranking" person in the LDS Church. If Mr. Scott attended meetings relating to these matters, he would not have simply been a bystander stopping in to see what was going on because he had nothing better to do. If Mr. Scott was in attendance in these meetings, in which matters central to plaintiff's claims in this lawsuit were discussed, given his "high rank", he likely was presiding over such meeting and, therefore, in charge and responsible for the meeting and everything discussed in the meeting.

Clearly Mr. Scott possesses discoverable information and his deposition should be allowed to go forward.

## II. CITO and CITO-LT communicated that Mr. Scott was involved in the establishment of Wyoming Defendants, CITO-LT.

As proclaimed under the "apostolic beginnings" link of the CITO website, Mr. Scott was instrumental in the establishment of CITO. The dean of CITO is Robert Hayden. In September of 2006, Mr. Holiday inquired as to who CITO-LT (a defendant in the Wyoming dispute) was. Dr. Hayden responded in an e-mail that "CITO-LT (Larry and Steve) was formed at the request

of the brethren". Richard Heaton claims that the general term "brethren" in LDS vocabulary is a reference to general authorities of the LDS Church. Later, when asked who the brethren were, Larry Howick and Steve Brandau told Eleutian employees, Sam Merrill and Kent Holiday, that the "brethren" who requested they form the company was Richard Scott.

In addition to those communications, TALL product manager Kent Parry, Richard Heaton, BYU employee Kent Parry, and BYU-H assistant dean David Wade have all, at one time or another, communicated that Richard Scott had oversight of the licensing and/or assignments related to the TALL product.

Again, it is apparent that Mr. Scott is linked closely to the issues in dispute in the Wyoming litigation.

### III.    What Mr. Scott Doesn't Say in His Affidavit Is Telling.

Perhaps the most convincing item as to what Mr. Scott knows and doesn't know regarding the subject matter of this dispute is his affidavit. Mr. Scott doesn't disavow knowledge of CITO or the defendants in this matter, CITO-LT, and Global Educational Technology. Mr. Scott also does not disavow any knowledge relating to the series of related transactions in the fall of 2007 which gave rise to the counterclaim in the Wyoming dispute, namely, IRI's cancellation of BYU and BYU-H's TALL licenses and IRI's subsequent licensing of the TALL product to the defendants, along with BYU-H's alleged assignment of the Eleutian license agreement to the defendants in order to create a counterclaim in the Wyoming action. In fact, Mr. Heaton claims that as early as the summer of 2007, Mr. Scott was well aware that a private entity was going to replace BYU-H as the sublicensee of the TALL products (Heaton Depo. at 159). That private entity was Global Educational Technology/CITO-LT, the defendants

12

and counterclaimants in the Wyoming dispute. It cannot be claimed that Mr. Scott had no knowledge of the series of related transactions that gave rise to the counterclaim in this dispute. Indeed, given Mr. Scott is one of the "highest ranking" officials in the LDS Church[2] (as argued by Mr. Scott in his brief), and Mr. Scott's knowledge of the planned transfer months prior to it happening, one could reasonably conclude that Mr. Scott was indeed involved in, or presided over, the approval of the series of related transactions giving rise to the counterclaim in this matter.

## IV. Rebuttal

There are several points made by Mr. Scott in his brief that simply must be rebutted. First, Eleutian has now taken the deposition of Mr Heaton, who made it clear that the decisions regarding the licensing and the series of related transaction in the fall of 2007 were made by someone that was above him in the "line of leadership" (Heaton depo at 156-157). Opposing counsel would have Eleutian subpoena the other two persons in that line until they eventually got to Richard Scott. However, it is clear that Richard Scott presided over meetings in which BYU-H licensing of TALL to third parties was discussed. Richard Scott was aware of and likely approved Global Education Technology/CITO-LT's sublicense and assignment from IRI and BYUH. Why should Eleutian go from one individual to the next when it is clear that Richard Scott, the "high ranking" official, was directly involved in meetings and decisions regarding the

---

[2] Eleutian counsel is a member of the LDS church and has been for over 25 years. Although counsel is aware of a line of authority in the LDS Church (which is not a caste type system), Mr. Scott's brief is the first time counsel has ever heard of a "ranking" system in the LDS Church, namely that some members in the church are "higher ranking" than other members of the church. Indeed, after an extensive search of LDS.ORG the official website of the LDS Church, counsel was unable to find a single reference related to the ranks of certain church callings or church members. Nevertheless, counsel concedes that Richard Scott, given his current calling, is more authoritative on the subject matter and, if he claims to be higher ranking than other members of the LDS Church, he must be.

licensing and assignments and has unique, personal and direct knowledge of the subject matters surrounding the Wyoming litigation?

Mr. Scott also argues that the taking of his deposition would be unduly burdensome and thus must be quashed under Fed.R.Civ.P. 45(c)(3)(A)(iv). Mr. Scott's argument regarding his requested appearance being "excessively" burdensome is rooted in the conclusory averment that he is a busy person. Isn't everyone? Being a busy person is certainly not grounds to quash a subpoena under Rule 45. *See Clinton, supra; see also Hadnot v. Amos*, 291 F.Supp. 309 (D.C.Ala. 1968) (court refused to quash subpoena of Governor to appear for deposition even though Governor claimed he was busy with important executive functions). Mr. Scott was requested to appear in downtown Salt Lake City. He likely lives and certainly works within walking distance of the location of his requested appearance. Furthermore, Eleutian counsel offered to work with Mr Orton on the timing of Mr. Scott's appearance as to not leave Mr. Scott sitting in the waiting room while Mr. Heaton's deposition was being conducted. Mr. Scott does not claim to have been out of town, or even to have plans to be out of town during the scheduled time of his deposition. Mr. Scott coyly claims that he spends a "substantial portion of his time travelling throughout the world . . ." (Scott Memo at 6), however, whether he was actually travelling throughout the world at the scheduled time of his deposition is left up in the air.

Finally, Mr. Scott argues that it would be unduly burdensome under Rule 45 because, even if he were available, he would not have had "sufficient time to adequately prepare". Mr. Scott claims to know nothing related to this dispute, though. (Scott Aff., ¶ 14). What then would Mr. Scott need to prepare for? If Mr. Scott has no knowledge of any of the facts surrounding the Wyoming dispute, his deposition would be extremely short and preparation would be minimal.

14

With substantial time required to prepare for a deposition, one could assume that Mr. Scott likely knows more than he has communicated in his affidavit and memorandum regarding this dispute and the underlying transactions giving rise to the Wyoming claims.

## CONCLUSION

Eleutian would not have subpoenaed Mr. Scott had his deposition not been needed. Indeed, the subpoena of Mr. Scott was pondered and contemplated by Eleutian counsel for multiple days.  However, Mr. Scott's deposition is necessary.  Mr. Scott has direct, relevant and unique knowledge relating to the underlying transactions giving rise to the Wyoming dispute. For all the foregoing reasons, Mr. Scott's Motion to Quash and Motion for a Protective Order should be denied and the deposition of Mr. Scott should go forth without delay.  He has failed to satisfy the high burden of proof applicable to his request and has not, in any way, demonstrated the existence of extraordinary circumstances that would mandate quashing his deposition.

RESPECTFULLY SUBMITTED this $\underline{5}$ day of June, 2008.

Brian J. Holiday (8931)
Eleutian Legal Dept.
215 2nd St.
Ten Sleep, WY 82442
Phone 307-366-2902
Fax  307-366-2904
brian@eleutian.com

Attorney for Plaintiff Eleutian Technology

15

## CERTIFICATE OF SERVICE

The undersigned certifies that on the ___5___ day of June, 2008, a true and correct copy of the **MEMORANDUM IN OPPOSITION TO RICHARD SCOTT MOTION TO QUASH AND MOTION FOR A PROTECTIVE ORDER** was served upon the following via electronic mail and via conventional mail:

William W. Maycock
Smith, Gambrell & Russell, LLP
1230 Peachtree Street, N.E.
Suite 3100, Promenade II
Atlanta, Georgia 30309-3592
bmaycock@sgrlaw.com

Henry F. Bailey, Jr.
P.O. Box 1557
221 East 21st Street
Cheyenne, Wyoming 82003
Fax (307) 638-7749
hfb@baileystockharmon.com

R. Willis Orton
Kirton & McConkie, P.C.
60 E. South Temple, Suite 1800
Salt Lake City, UT 84111
worton@kmclaw.com

16

Brian J. Holiday (8931)
Eleutian Legal Dept.
215 2nd St.
Ten Sleep, WY 82442
Phone 307-366-2902
Fax 307-366-2904
brian@eleutian.com

Attorney for Plaintiff Eleutian Technology

---

| ELEUTIAN TECHNOLOGY, LLC, a Wyoming limited liability company, | **DECLARATION OF KENT R. HOLIDAY** |
|---|---|
| Plaintiff, | Case No. 2:08-mc-331-TC |
| | Judge Tena Campbell |
| vs. | Magistrate Judge Brooke C. Wells |
| GLOBAL EDUCATION TECHNOLOGIES, LLC, a Georgia limited liability company, formerly known as CITO-LT, a Georgia limited liability company; STEVE BRANDAU; LARRY HOWICK; JANIS KOH; and John Does 1-5 | |
| Defendants. | |
| GLOBAL EDUCATION TECHNOLOGIES, LLC, a Georgia limited liability company, | |
| Counterclaimant, vs. | |
| ELEUTIAN TECHNOLOGY, LLC, a Wyoming limited liability company, | |
| Counterclaim Defendant. | |

---

Kent R. Holiday states as follows:

1.    I am the President of Eleutian Technology, LLC ("Eleutian"), a Wyoming limited liability company, and the Plaintiff in *Eleutian Technology, LLC v. Global Education*

**EXHIBIT 1**

*Technologies, LLC, et al.*, Case No. 07-CV-181-J, United States District Court for the District of Wyoming.

2.    I have been the President of Eleutian since the company was founded in Wyoming in or about March 2006. As President, I am directly responsible for all aspects of Eleutian's day-to-day operations.

3.    In or about the Fall of 2005, I was living and working in Korea. I was a corporate executive at KT. KT is one of the world's largest telecommunications companies with over 40,000 employees and a presence throughout the world. I am an American and as such, was the first, and still the only non-Korean to hold a corporate executive position at KT. I am also a member of the LDS Church.

4.    In the Fall of 2005 Dr. Hayden, along the with assistant dean of CITO, David Wade contacted me at KT via telephone and explained to me that he was the Dean of CITO, an entity related to BYU-H, and that CITO was under the direction of Richard Scott. Dr. Hayden then communicated the vision of CITO and asked me if I would assist CITO in Korea. I responded that I was not in a position to assist at that time, but would shortly be leaving KT and would be in contact with CITO.

5.    Shortly thereafter, I did leave KT and in early 2006 founded Eleutian, a Wyoming company which teaches English to Asian students via videoconferencing over the internet using Wyoming teachers. Eleutian has quickly grown to become one of the largest private employers in Wyoming's Big Horn Basin with over 170 employees.

6.    Upon establishing Eleutian, I contacted Assistant Dean David Wade of CITO and discussed ways in which Eleutian could work together with CITO.

7.    In or about the Spring of 2006, BYU-H received rights to license software known as TALL. TALL was created by LDS Church employees at the Missionary Training Center and *Brigham Young University. The English Certification Test (ECT) is a component of the TALL* product. CITO was put in charge of administering the TALL products on behalf of BYU-H.

8.    In or about April 2006, Eleutian negotiated and entered into a license agreement with BYU-H ("Agreement"). The Agreement allowed Eleutian to license the ECT software for a twenty (20) year term in return for licensing fees paid to BYU-H. For the first year, Eleutian had rights to offer the ECT to its customers in Korea and Japan, in years 2-20, Eleutian has the rights to offer the ECT to Eleutian customers on a worldwide basis. Eleutian negotiated the Agreement with CITO and Dr. Hayden signed the agreement on behalf of BYU-H.

9.    Shortly after Eleutian and BYU-H/CITO entering into the Agreement, Eleutian was contacted by Larry Howick, who claimed he was a representative of an entity referred to as CITO-LT. Mr. Howick claimed certain rights and responsibilities relating the Agreement. Mr. Howick and CITO-LT are defendants in the current Wyoming action.

10.    Within a month of licensing the ECT to Eleutian to sell to Eleutian customers in Korea, CITO-LT negotiated with and sold (allegedly on behalf of BYU-H) an "Exclusive License" to the Korean market. The license purported to license the TALL software, including the ECT to a new entity CITO-LT/APAC, on an exclusive basis for the territory of Korea. Ms. Janis Koh, a proprietor of CITO-LT/APAC is also a defendant in the Wyoming action.

11.    I did not understand who CITO-LT was and what role CITO-LT was to play in the Eleutian/BYU-H relationship. In an e-mail sent in September 2006, I questioned Dr. Hayden, dean of CITO, as to who Larry and Steve (CITO-LT proprietors) were. Dr. Hayden responded back that "CITO-LT (Larry and Steve) was formed at the request of the brethren" (See Exhibit "A" attached hereto.)

12.    In a phone call shortly after the "brethren" communication, I communicated that I thought it was odd that general authorities of the LDS Church would be involved in establishing private entities and asked Steve Brandau and Larry Howick which "brethren" were involved with in establishment of CITO-LT and what the purpose of CITO-LT was. One of the individuals (Larry or Steve) replied that Richard Scott had requested CITO-LT be established to coordinate some of the business affairs of CITO. Although I am uncertain which of those individuals

communicated that, however, I am certain they were both on the phone and one of them did communicate it. Eleutian employee Sam Merrill was also included on the call.

13. Indeed numerous individuals with knowledge of this dispute have all told me personally that Richard Scott was involved in and responsible for the decisions relating to either the establishment of CITO-LT, BYU-H's licensing of the TALL products, or the eventual licensing and assignments of certain rights to the Wyoming defendants in the fall of 2008. These individuals include Dr. Hayden, Mr. Howick or Mr. Brandau, David Wade, and Kent Parry.

14. I was unaware during the time of the communications referred to in paragraphs 11 and 12 of this Declaration that CITO-LT had actually not been established and the company didn't actually exist.

15. Eventually, CITO-LT and CITO-LT/APAC, along with their proprietors, began interfering with certain Eleutian contracts and customers in the Korean market. Those communications resulted in Eleutian filing the current Wyoming litigation in August 2007, in which Eleutian requested, among other things, injunctive relief to stop CITO-LT and other defendants from interfering in Eleutian business.

16. I immediately made BYU, BYU-H and LDS Church personnel aware of the litigation in August 2007 via e-mail.

17. Subsequent to the filing of the Wyoming litigation requesting an injunction prohibiting CITO-LT's interference with Eleutian business and customers, Brigham Young University (BYU), BYU-H, IRI and Defendant CITO-LT entered into a series of related transactions which would make any injunctive relief imposed by the Wyoming Court moot and which resulted in 1) IRI withdrawing BYU'H's (and thereby Eleutian's) rights to sublicense the ECT, 2) IRI licensing the TALL software exclusively to CITO-LT (which was then doing business under the name Global Education Technology), and 3)BYU-H allegedly assigning its rights under the Eleutian-BYUH agreement to CITO-LT. These related transaction occurred in or about October and November of 2007. Mr. Kent Parry, former BYU-Provo employee and TALL

Oversight Committee member, told me that these transactions were all done under the supervision of, and approved by Richard Scott.

18.     Within days of these transactions being completed, CITO-LT then filed its Answer in the Wyoming litigation, which included a counter-claim based on its newly acquired assignment, claiming Eleutian was somehow in breach of the Agreement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 5TH day of June, 2008.

Kent R. Holiday

| | |
|---|---|
| **From:** | Kent Holiday (kholiday@eleutian.com) |
| **To:** | 'Robert Hayden' |
| **Subject:** | RE: Thanks for your time |
| **CC:** | 'sam@eleutian.com'; 'Brian H'; 'PJ Rogers' |
| **BCC:** | |
| **Sent:** | 9/19/2006 5:51:42 PM |
| **Attachments:** | |

Bob,

Thank you for your email. Agents are not covered under our agreement. Can you confirm that CITO-LT is a consultant or affiliate of BYUH/CITO? As just an agent they would not be covered under our agreement and we will not be able to share information with them per our agreements if they are not a consultant or affiliate.

On another note we still have not received the ECT software and necessary information and documentation that we need to be able to start working with our partners. Please advise who we should be in contact with to receive this information.

Best Regards,
Kent
-----Original Message-----
From: Robert Hayden [mailto:haydenr@byuh.edu]
Sent: Tuesday, September 19, 2006 4:19 PM
To: kholiday@eleutian.com
Cc: Larry@CITO-LT.com; Steve@CITO-LT.com
Subject: RE: Thanks for your time

thank you Kent for you inquiry... CITO-LT (Larry and Steve) was formed at the request of the brethren... Dave was not authorized to sign an ND... however, it is our position not to infringe on any of the work that you have been working on as it relates to teaching English... Dave has been counseled not to extend himslef as a representative of BYUH and, more specifically, he is not to represent any of the Tall projects that CITO is working on... CITO-LT is under my direction as CITO launches the use of the TALL products... we (Larry, Steve and I) look forward to working with you so that you can be successful while BYUH finds success with the TAll products... I hope that this email has been helpful... CITO-LT is CITO's agent...


Dr. Robert L. Hayden, Dean

Center for Instructional Technology & Outreach
Brigham Young University-Hawaii

808-293-3474 Voice
808-561-5280 Cell
808-293-3789 Fax
haydenr@byuh.edu
>>> "Kent Holiday" <kholiday@eleutian.com> 09/15/06 5:19 PM >>>
Bob,

ET0173

Page 1 of 6

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ELEUTIAN TECHNOLOGY, LLC, a Wyoming limited liability company, | ) Case No. 07-CV-181-J<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Deposition of:<br>) RICHARD I. HEATON, Ph.D. |
| | ) |
| GLOBAL EDUCATIONAL | ) |
| TECHNOLOGIES, LLC, a Georgia | ) |
| limited liability company f/k/a | ) |
| CITO-LT; STEVE BRANDAU; LARRY | ) |
| HOWICK; JANIS KOH; and JOHN DOES | ) |
| 1-5, | ) |
| | ) |
| Defendants. | ) |

May 21, 2008 - 8:31 a.m.


Location:  GARCIA & LOVE COURT REPORTING and VIDEOGRAPHY

257 East 200 South, Suite 300

Salt Lake City, Utah  84111


Reporter:  Angela L. Kirk, RPR, CSR

and Notary Public in and for the State of Utah

**EXHIBIT 2**

Page 18

1    A.   In the Missionary Department, it's the Director's
2    Council.
3        Q.   The Director's Council?
4        A.   In the Missionary Department.
5        Q.   Thank you. And what does the Director's Council do?
6        A.   The Director's Council are those directors in the
7    Missionary Department, of which I am one, who have
8    responsibility for all facets of missionary work around the
9    world in regard to staff support to ecclesiastical leaders.
10       Q.   When you talk about staff support to ecclesiastical
11   leaders, what does that mean?
12       A.   An ecclesiastical leader is one who is a priesthood
13   leader, a member of the clergy, if you will, of the Church of
14   Jesus Christ of Latter-day Saints. They have ultimate
15   responsibility for missionary work throughout the world. The
16   Missionary Department acts as a staff function in support of
17   that -- of those General Authorities, is the term that we use
18   to describe them, who are assigned to the missionary effort.
19   And so the Missionary Department provides the staff support
20   for that group.
21       Q.   And who do you report to as -- are you the chair of
22   that committee?
23       A.   No, I am not. Steven B. Allen is the chair of the
24   Director's Council.
25       Q.   And who does he report to?

Page 19

1        A.   He reports to the executive director of the
2    Missionary Department. That is a General Authority. Today
3    that is Richard G. Hinckley.
4        Q.   Are you Mormon?
5        A.   Yes, I am.
6        Q.   There was something about your resume that stood out.
7    When Mormons refer to "the Brethren," who does that generally
8    refer to?
9        MR. ORTON: Objection, vague, speculation.
10       A.   When I refer to "the Brethren," I refer to General
11   Authorities who are members of the Quorum of the 12 Apostles,
12   or the First Presidency, or who are members of one of the
13   quorums of the First or Second Quorum of the 70, or a member
14   of the Presiding Bishopric.
15       Q.   There's a lawsuit happening in Wyoming between
16   Eleutian Technology and CITO-LT and other individuals. Are
17   you aware of this lawsuit?
18       A.   I am aware of it, yes.
19       Q.   Do you have an understanding what the lawsuit is
20   regarding?
21       A.   I have a general understanding. I have not reviewed
22   any documents that describe the exact detail of that lawsuit.
23       Q.   And what is your -- sorry. What is your general
24   understanding?
25       MR. ORTON: I object to the extent it calls for

Page 20

1    disclosure of communications between myself and the witness,
2    which is attorney/client privileged and I instruct him not to
3    answer. If he can answer it other than through what he's
4    talked to me -- I've talked to him about, he can answer.
5        A.   I would have to claim attorney/client privilege,
6    because outside of these communications the only thing I'm
7    aware of is that there is a -- there is a lawsuit, a general
8    understanding that Eleutian is involved, that CITO-LT is
9    involved. And the exact nature of the claims of that lawsuit,
10   I could not say anything more except for that it's regarding
11   the licenses that have been -- that have been given.
12       Q.   When you say "it's regarding the licenses that have
13   been given," what do you mean by that? And again, I'm not
14   asking for what your attorney's told you.
15       MR. ORTON: Again, but to the extent you know
16   anything about the licenses, if that was communicated to you
17   by me, I instruct you not to answer the question.
18       A.   Okay. Thank you. I know that BYU-Hawaii granted a
19   license -- granted licenses to use aspects of TALL technology,
20   which would include the English Certification Test, to several
21   sublicensees. And I just -- I understand that generally there
22   is a conflict in -- a perceived conflict in relation to some
23   of those licenses.
24       Q.   (By Mr. Holiday) Have you ever seen any documents
25   filed with the court in this case?

Page 21

1        A.   No.
2        Q.   Have you ever been sent any documents filed with the
3    court in this case?
4        A.   Well, I don't know which documents have been filed
5    with the court.
6        MR. ORTON: He received a subpoena.
7        A.   I received a subpoena, and we collected all documents
8    in our possession and submitted them.
9        Q.   (By Mr. Holiday) Have you ever seen a copy of the
10   Complaint in this matter?
11       A.   No.
12       Q.   Have you ever been sent a copy of the Complaint in
13   this matter?
14       A.   Well, I've been sent a subpoena, which has --
15       MR. ORTON: Just answer the question.
16       A.   -- one line, so --
17       MR. ORTON: Just answer the question.
18       A.   -- not to my knowledge.
19       MR. ORTON: Just answer the question.
20       A.   Not to my knowledge. But...
21       Q.   Do you sit on any other committees or councils
22   relating to the Missionary Department or the language training
23   or anything to do with the missionary division?
24       A.   Not beyond what I have been able to recall
25   previously.

Page 26

1   A.   We had -- we no longer had responsibility for
2   developing the TALL software. I probably should explain a
3   little bit more about the software.
4        MR. ORTON: No, just answer the question.
5   A.   So we did develop courses using the TALL software for
6   missionaries, but we did not have responsibility for
7   developing the TALL software.
8   Q.   (By Mr. Holiday) And the TALL software, that teaches
9   people a foreign language; is that correct?
10   A.   The TALL software is an engine, it's a software
11   engine that can -- that can manipulate content to teach
12   people -- that can manipulate video text and audio files
13   created in whatever language they've been created in and
14   administer the learning -- the learning modules that have been
15   developed in whatever language they've been developed in to
16   help people learn a language.
17   Q.   And is that language English or is that language a
18   lot of different languages?
19   A.   It's a lot of different languages.
20   Q.   So somebody trying to learn German can use the TALL
21   product in the Missionary Training Center; is that correct?
22   A.   That is correct.
23   Q.   Then you seemed to -- in 2001, the software
24   development responsibilities transferred to BYU. Did you
25   retain, "you" meaning the Missionary Training Center, retain

Page 27

1   some sort of duties or obligations or responsibilities
2   regarding the TALL products?
3        MR. ORTON: Objection, calls for a legal conclusion,
4   speculation.
5   A.   Our only -- our only responsibility was to continue
6   to development our own language courses at the Missionary
7   Training Center, which were based on the TALL software that
8   had been completed to date.
9   Q.   (By Mr. Holiday) You said previously you sit on
10   the -- or you did sit on the TALL Oversight Committee?
11   A.   (Nodding head.)
12        MR. ORTON: You have to answer audibly.
13   A.   Yes. Thank you for the reminders.
14   Q.   When were you put on that committee?
15   A.   That committee was in 2005, January of 2005.
16   Q.   And is that when it was created?
17   A.   Yes.
18   Q.   And who was the committee created by?
19   A.   The committee was created by legal agreement between
20   Intellectual Reserve, Inc., and Brigham Young University.
21   Q.   And who decided to create the committee?
22        MR. ORTON: Objection, calls for speculation.
23   A.   I don't know how to answer that question. The --
24        MR. ORTON: If you don't know who made the decision,
25   that's what he's asking for. If you don't know who made the

Page 28

1   decision, then don't speculate.
2   A.   Yeah, I don't know that you can say that any one
3   person made that decision.
4   Q.   (By Mr. Holiday) Was it a group of people that made
5   that decision?
6        MR. ORTON: If you know.
7   A.   Yes, it was a group of people.
8   Q.   And who was included in that group of people?
9   A.   That group of people would include myself, Sandra
10   Rogers, vice president of Brigham Young University, Steven B.
11   Allen.
12   Q.   Is there anybody else?
13   A.   But there may have been others who had input, but not
14   to my direct knowledge.
15   Q.   So yourself, Sandra Rogers, and Steven B. Allen?
16   A.   (Nodding head.)
17        MR. ORTON: You have to answer audibly.
18   A.   Yes.
19   Q.   And who was put on the initial committee?
20   A.   I was asked to chair the committee. Sandra Rogers
21   was placed on the committee. And Keith Roberts, vice
22   president of Brigham Young University-Hawaii, was also asked
23   to serve on the committee. Each of the three of us had a
24   technical representative who also sat on the committee.
25   Q.   So a technical representative, so just so I

Page 29

1   understand that correctly, besides yourselves, you each had
2   someone who understood the technical aspects --
3   A.   Yes.
4   Q.   -- of the TALL product?
5   A.   That is correct.
6   Q.   And they also sat on the committee?
7   A.   Yes, they did.
8   Q.   And who were those individuals?
9   A.   In 2005, they were Chris Randall for the Missionary
10   Training Center.
11   Q.   And that would be your --
12   A.   That was my technical representative. Kent Parry was
13   on the committee, representing with Sandra Rogers. And David
14   Wade was on the committee, with Keith Roberts representing
15   BYU-Hawaii.
16   Q.   And so were there six members on the TALL Oversight
17   Committee?
18   A.   Yes.
19   Q.   Why was the committee created?
20   A.   BYU -- under BYU's direction, they -- the TALL -- the
21   group who were working on TALL at BYU had not been able to
22   bring a product to market. They had some funding difficulties
23   and seemed to need direction and mentorship to help them stay
24   focused in accomplishing the purposes -- their purposes. So
25   this committee was organized to provide that direction.

Page 34

1   Q.   (By Mr. Holiday)  To your knowledge, was CITO-LT
2   involved in those discussions?
3   A.   To my knowledge, they were not.
4   Q.   Was Larry Howick or Steve Brandau involved in those
5   discussions?
6   A.   To my knowledge, they were not.
7   Q.   So I guess what I don't understand is, you wanted to
8   have -- you and Sandra Rogers and Steve Allen saw a need for a
9   committee?
10  A.   Yes.
11  Q.   Did somebody approve the committee being formed, or
12  did you just have the authority in your job to just create the
13  committee?
14        MR. ORTON:  Objection, compound question, assumes
15  facts.
16  A.   Do you want to break that down one at a time and I'll
17  answer them the best I can one at a time.
18  Q.   Who approved the creation of this committee?
19        MR. ORTON:  Objection, speculation.
20  A.   The committee was designated in the legal agreement
21  between IRI and BYU, so whomever has to approve those
22  agreements would have had to approve by association the
23  membership of the committee.
24  Q.   (By Mr. Holiday)  And do you know who approved those
25  agreements?

Page 35

1   A.   No, I don't.
2   Q.   And that agreement was between BYU and IRI, is that
3   your testimony?
4   A.   Yes.
5   Q.   And that's BYU-Provo; is that correct?
6   A.   That's correct.
7   Q.   You weren't involved in the approval process of that
8   agreement?
9   A.   I did not have a vote to approve or disapprove.  I
10  was never asked to vote to approve or disapprove.
11  Q.   Did you talk to anybody who did have a vote to
12  approve or disapprove?
13  A.   I don't know exactly who had a vote to approve or
14  disapprove, but I talked with my line management.
15  Q.   And that was Steven Allen?
16  A.   Yes.
17  Q.   Was there anybody else you talked with?
18        MR. ORTON:  Concerning that issue?
19        MR. HOLIDAY:  Concerning that issue.
20  A.   Concerning the issue of approval of the -- or
21  development of the agreement?
22  Q.   (By Mr. Holiday)  Approval of the contracts, or of
23  the contract, I think it's singular.
24  A.   In terms -- yes, there were some discussions with
25  Sandra Rogers at BYU in terms of providing information in the

Page 36

1   creation of the -- of the -- of the agreement, but not
2   regarding its approval.
3   Q.   Did you discuss -- other than Sandra Rogers and
4   Steven Allen, and prior to the agreement being signed, did you
5   discuss the need to set up the TALL Oversight Committee with
6   anyone other than those two?
7   A.   Yes and yes.
8   Q.   And who did you discuss that with?
9   A.   Chris Randall and others of my staff.  And there
10  may -- there may have been discussion with Kent Parry, but I
11  don't recall exactly those issues.
12  Q.   Did you ever have discussions with Richard Scott
13  prior -- let me rephrase the question.
14        Did you ever have discussions with Richard Scott
15  regarding the creation of the TALL Oversight Committee prior
16  to the agreement being signed?
17  A.   May I ask a clarifying question?  When you say
18  "discussions," I believe I may have been in a meeting where
19  the -- where the need for a committee was mentioned where
20  Richard Scott was present, but I never -- I do not recall any
21  one-on-one discussions.
22  Q.   Tell me about that meeting.
23        MR. ORTON:  Objection, foundation.
24  A.   That's a difficult question to answer because as a --
25  as a leader, as an ecclesiastical leader, I am often in

Page 37

1   meetings where he is, and which meeting was -- where this was
2   discussed and the timing of the meeting, was it prior to or
3   following the creation of the committee, I can't recall at
4   this point.
5        The nature of any discussion of such a meeting was
6   the need to provide some guidance and direction to the group
7   at BYU who was working with TALL to help them bring a product
8   to market and to accomplish their development needs.
9   Q.   And Richard Scott was involved in that meeting?
10       MR. ORTON:  Objection, speculation, no foundation.
11  A.   There was at least one meeting where such a dialog
12  was held where he was present.
13  Q.   (By Mr. Holiday)  Did he have any input?
14       MR. ORTON:  Objection, vague, ambiguous, no
15  foundation.
16  A.   His desire -- he did express a desire to see this
17  product be developed and to continue to have a -- to be a
18  viable product and was in support of whatever would be
19  required to help that happen.
20  Q.   When you say he was -- he wanted a viable product,
21  what does that mean?
22  A.   For a software product to have enduring life, it has
23  to be continually updated to match platforms as they change
24  and hardware as it changes, software products as they change.
25  All of that requires continual work on the platform.  And BYU

Page 38

1  was struggling to get a product to market that could generate
2  some income stream for them.
3       And so if it -- if it -- if in product -- in software
4  development, if there ceases to be an effort to maintain as a
5  current product, that product will die because it will no
6  longer run on machines, it will no longer be a viable product.
7    Q.  And Mr. Scott didn't want that to happen?
8    A.  To the best of my knowledge, that was his intent.
9    Q.  Did he have a solution?
10      MR. ORTON:  Objection, vague, vague as to time frame, no
11  foundation.
12   A.  He did not have a solution.  He wanted -- he was in
13  favor of whatever it would take to solve the problem.
14   Q.  (By Mr. Holiday)  And did you propose a solution to
15  the problem?
16   A.  A solution was proposed.  I was part of the dialog in
17  that proposal to have a committee, but that was not
18  necessarily in the meeting with Elder Scott.
19   Q.  When was a solution proposed?
20   A.  Probably sometime in late -- in the second half of
21  2004.
22   Q.  And what was the solution?
23      MR. ORTON:  That was suggested?
24   Q.  That was proposed.
25   A.  The proposed solution was to formulate a committee

Page 39

1  that could provide some oversight to this -- to this team who
2  was at BYU.
3    Q.  And who proposed that solution?
4       MR. ORTON:  Objection, asked and answered.
5    A.  Collectively, it was proposed collectively.
6    Q.  (By Mr. Holiday)  Including yourself?
7    A.  Yes.
8    Q.  And who was that solution proposed to?
9    A.  It was proposed to -- independently to Steven B.
10  Allen, who is my supervisor.  And then it was -- and then
11  Sandy Rogers had to propose it to her line of leadership as
12  well.
13   Q.  Did Richard Scott ever approve the proposal?
14      MR. ORTON:  Which proposal?  The one that he made to
15  his people or the one that she made to their people, which
16  one?
17   A.  The --
18      MR. ORTON:  Objection, vague, ambiguous.
19   A.  I believe I stated before that whoever approved this
20  agreement between IRI and BYU were the ones who approved this
21  committee, because it's embedded, it was written into the
22  agreement, into the language of the agreement.
23   Q.  (By Mr. Holiday)  And it's your testimony that you
24  don't know who gave the ultimate approval for that contract to
25  be signed?

Page 40

1    A.  That is correct.
2    Q.  It may have been Richard Scott?
3       MR. ORTON:  Objection, asked and answered, Counsel,
4  calls for speculation.
5    A.  I don't know that.
6    Q.  (By Mr. Holiday)  Did this agreement in any way
7  contemplate the establishment of CITO-LT?
8    A.  No, it did not.
9    Q.  Did it in any way contemplate a private, for-profit
10  commercial entity being involved in the distribution of the
11  TALL software?
12   A.  The 2005 agreement between BYU and IRI, of which
13  we've been discussing, did anticipate -- did anticipate BYU
14  would have the rights to have a commercial vendor market
15  whatever product was completed by the TALL group.
16   Q.  And when you say "TALL group," are you referring to
17  the group at BYU?
18   A.  I am referring to BYU.  The group at BYU was working
19  on the TALL software product.
20   Q.  And that group was headed by Kent Parry; is that
21  correct?
22   A.  To the best of my understanding, he was the
23  supervisor of that group.
24   Q.  Did BYU ever express to you any intent to license the
25  software to for-profit entities?

Page 41

1       MR. ORTON:  When?  Objection, vague as to time frame.
2    A.  From the creation of the agreement, BYU had the
3  intent to license the software to a commercial entity.
4    Q.  (By Mr. Holiday)  Did the agreement also allow BYU to
5  sublicense the software to -- I'm sorry, to Brigham Young
6  University-Hawaii?
7       MR. ORTON:  Objection, calls for speculation, the
8  document speaks for itself, calls for a legal conclusion.
9    A.  The document, the agreement allowed for sublicensing
10  of the software.  I don't believe it restricted any.
11   Q.  Were you aware of an intent on BYU's part to
12  sublicense the software to Brigham Young University-Hawaii
13  either immediately prior to or within a month after the
14  signing of this agreement?
15      MR. ORTON:  Objection, assumes facts, no foundation.
16   A.  I'd have to say I don't -- I don't recall.  I don't
17  recall that it was in that time frame that you -- that you
18  mentioned.
19   Q.  (By Mr. Holiday)  What is the function of the TALL
20  Oversight Committee?
21   A.  The TALL Oversight Committee was to --
22      MR. ORTON:  I'm going to object to that as being
23  asked and answered.  Go ahead.
24   A.  -- was to guide the -- to guide the plans and the
25  work of the TALL group at BYU to help them bring a product to

Page 42

1   market.
2        I will add one more thing to that answer, and to
3   ensure that in any of their work that they did that they were
4   fulfilling -- that it was in harmony with the agreement
5   between IRI and BYU.
6        Q.   So if some -- if an entity was doing something that
7   was not in accordance with that agreement, did that
8   responsibility of addressing that -- did the responsibility of
9   addressing that fall on the TALL Oversight Committee?
10       MR. ORTON:  Objection, calls for a legal conclusion.
11       A.   The TALL Oversight Committee was not a firm decision-
12  making committee but an advisory committee.  The TALL group at
13  BYU was supervised directly by their line leadership.
14       If the TALL Oversight Committee became aware, we
15  would make sure that the -- Sandra Rogers, who was at BYU, if
16  that was -- if the concern resided on that side, that they
17  became aware so that they could handle -- they were
18  responsible for that.
19       Q.   (By Mr. Holiday)  Sorry, BYU was responsible for
20  that?
21       A.   Well, if a problem occurred, if there was -- if there
22  were a problem regarding adherence to provisions of the
23  licensing agreement, and that problem was occurring inside of
24  BYU TALL group's organization, then it would be BYU's
25  responsibility to manage that and we would help them, make

Page 43

1   them aware.
2        Q.   Did a problem ever arise regarding the licensing?
3        A.   No.
4        Q.   There was -- a problem never arose between -- with
5   BYU licensing the product from IRI?
6        A.   No.  In -- if we're talking -- which time frame are
7   we talking about?
8        Q.   Any time frame.
9        A.   Any time frame.  The only concerns that were
10  addressed relative to the adherence to the licensing agreement
11  that the TALL Oversight Committee became aware of were in
12  regard to BYU's sublicensing of the agreement to BYU-Hawaii.
13  There were no violations, but as we discussed the different
14  provisions, as BYU eventually did sublicense the right to
15  market the software, we were -- we discussed the provisions to
16  make sure that we were in harmony with that original
17  agreement.
18       Q.   Other than BYU sublicensing the software to be BYU-
19  Hawaii, are you aware of BYU sublicensing the software to any
20  other entity?
21       A.   I am not aware of them sublicensing the software to
22  any other entity.
23       Q.   Was Richard Scott aware of BYU sublicensing the
24  product to BYU-Hawaii?
25       MR. ORTON:  Objection, speculation.

Page 44

1        A.   The BYU -- BYU -- the IRI/BYU agreement gave IRI the
2   right to review any sublicensing agreement that BYU would
3   enter into and -- and grant approval for it.  Whoever -- and
4   again, I don't know who granted specifically approval for
5   those -- for those things.
6        Q.   (By Mr. Holiday)  So you don't have any knowledge of
7   Richard Scott being aware of BYU sublicensing to BYU-Hawaii?
8        A.   As a member of the presiding councils, he was aware
9   of most things that happened in general, and so I -- I believe
10  he was aware of that transaction.  I think I can say I'm sure
11  he was aware of that trans -- of that agreement.
12       Q.   "The agreement" being the sublicensing --
13       A.   The sublicensing agreement.
14       Q.   -- agreement with BYU-Hawaii?
15       A.   Yes.
16       Q.   What makes you so certain that he was aware of that?
17       A.   There were meetings where we discussed the desire of
18  BYU-Hawaii to become a sublicensee in the part of regular
19  reporting of our -- of the functions of the committee, and
20  so -- and I can recall meetings where he was present when such
21  possibilities were discussed.
22       Q.   Do you remember the details of any particular
23  meeting?
24       MR. ORTON:  Objection, foundation, vague as to time
25  frame.

Page 45

1        Q.   (By Mr. Holiday)  Let me restate the question.  You
2   referred to he was present at meetings where it was discussed
3   that BYU was going to sublicense to BYU-Hawaii; is that
4   correct?
5        A.   That is correct.
6        Q.   Do you remember any other details about those
7   meetings, the date?  Let's start with the date.  Do you
8   remember the dates of those meetings?
9        A.   I can't recall, without reference to notes, as to
10  when these occurred, but I would say if you say somewhere in
11  the -- probably early 2006, maybe late 2005, BYU-Hawaii
12  expressed a desire to -- to use the TALL product on their
13  campus and in their distance learning endeavors and -- and
14  to -- to arrange with others commercial entities who could
15  assist in the -- in the delivery of -- in the marketing of
16  TALL.  And the general nature of that desire was, I believe,
17  clear to Richard Scott and others in line leadership
18  positions.
19       Q.   So that that was the desire of BYU-Hawaii, to license
20  to other entities?
21       A.   (Nodding head.)
22       Q.   And these are commercial, for-profit entities?  You
23  need to audibilize it.
24       A.   Yes.  I'm thinking about that as you ask.  Yes.
25       Q.   Yes to both of those questions?

Page 158

1  pursue this restructuring of the licensing agreement.
2  Q.  And they pursued it with IRI; is that correct?
3  A.  Uh-huh.
4  Q.  Did you ever discuss the Larry and Steve request with
5  Richard Scott?
6      MR. ORTON: I think it's been asked and answered.
7  A.  Not specifically, no.
8  Q.  (By Mr. Holiday) Did you ever discuss with Richard
9  Scott that the BYU and BYU-Hawaii licenses were going to be
10 terminated, TALL licenses were going to be terminated and
11 transferred to a private entity?
12 A.  I didn't have personal dialog with Richard Scott on
13 that matter.
14 Q.  Do you know anybody who did?
15 A.  I cannot verify that -- whether or not my supervisor
16 reported up line that this was a direction that was being
17 pursued, but -- so I can't verify that.
18 Q.  Did he tell you he reported up line?
19     MR. ORTON: Up line to whom? Objection, vague,
20 ambiguous, vague as to time frame, no foundation.
21 A.  I don't recall.
22 Q.  (By Mr. Holiday) And your leader was?
23 A.  Steven, Steven B. Allen.
24 Q.  Steven Allen. Did Mr. Allen report to Richard Scott?
25 A.  Not directly.

Page 159

1  Q.  He reported to somebody else?
2  A.  He reports to Richard G. Hinckley. At the time --
3  can we go back to time frame?
4  Q.  Sure. At this time --
5  A.  At this time --
6  Q.  -- May of 2007.
7  A.  -- he reported to Richard G. Hinckley in May of 2007,
8  and Richard G. Hinckley reported to the Missionary Executive
9  Council, of which Richard Scott was a member.
10 Q.  So as you sit here today, you don't know whether or
11 not Richard Scott was aware that the TALL licenses were being
12 sublicensed to a private entity?
13 A.  From whom? The TALL sublicenses --
14 Q.  Were being licensed from IRI to a private entity.
15     MR. ORTON: Were or were going to be?
16 A.  Did he know that they were going to be, or did he
17 know that they --
18 Q.  (By Mr. Holiday) Well, let's start with did he know
19 that they were going to be?
20 A.  By June of 2007, he was aware that -- that BYU-Hawaii
21 was going to step out of the sublicensing picture and some
22 private entity was going to enter in its place, that
23 negotiations were underway to accomplish that.
24 Q.  And did he approve that?
25     MR. ORTON: Objection, no foundation, speculation.

Page 160

1  A.  He doesn't -- I don't know -- I just can -- I just
2  know that he was aware. But I'm not in a position to say did
3  he approve or disapprove, I don't know. He just was aware.
4  Q.  Is he aware that it actually happened?
5      MR. ORTON: Objection, speculation, no foundation.
6  A.  I don't know what he's aware of. But he would have
7  had access to information on that, but I don't know what he
8  would have been aware of.
9  Q.  (By Mr. Holiday) As you sit here today, you don't
10 know whether or not Richard Scott is aware that IRI licensed
11 the TALL software to a private entity?
12 A.  Maybe I misunderstood your time frame on your earlier
13 question. Today he is aware that they license to a private
14 entity and that BYU-Hawaii no longer has the sublicensing
15 rights.
16 Q.  And when did he become aware of that?
17 A.  Again, I don't know what he's aware of, but reports
18 that he -- but --
19     MR. ORTON: Don't speculate.
20 A.  Okay. I've got to quit speculating. I don't know
21 what he's -- I don't know what he's aware of.
22 Q.  When you said "reports," did somebody report that to
23 you?
24 A.  No, I report -- I report to my leader that this
25 agreement was terminated and this agreement was established

Page 161

1  and...
2  Q.  Did your leader tell you that Elder Scott was okay
3  with that, or something to that effect?
4      MR. ORTON: Objection, no foundation, speculation.
5  A.  I know that my leader was okay with it.
6      MR. ORTON: That wasn't the question. Just answer
7  the question.
8  Q.  That wasn't the question.
9  A.  I don't know.
10 Q.  Would you expect your leader to discuss the matter
11 with Mr. Hinckley and Mr. Scott?
12     MR. ORTON: Objection, speculation.
13 Q.  Just would you expect that?
14     MR. ORTON: Same objections.
15 A.  I don't know. They may, they may not.
16     MR. MAYCOCK: Brian?
17     MR. HOLIDAY: Yeah, go ahead.
18     MR. MAYCOCK: Where are we going with all this?
19     MR. HOLIDAY: There was a motion to quash filed
20 yesterday. I'm trying to understand what Mr. Scott knows and
21 what he knew and what he didn't know.
22     MR. MAYCOCK: I guess I'm wondering, from your
23 standpoint, what difference does it make? Of what consequence
24 is he? Why do you think he's significant or important?
25     MR. HOLIDAY: This isn't my deposition, Bill.

Page 154

1    A.   Yeah.
2    Q.   -- conclusion or -- I understand you're not an
3  attorney. You're not an attorney, are you?
4    A.   I am not an attorney.
5    Q.   I simply want to know -- you wrote this e-mail. I
6  just want to know what you were -- what you were thinking.
7         And so with that, you said that the termination of
8  the contract you referred to, you didn't -- you weren't
9  intending that to be unilateral; is that correct?
10   A.   That is correct.
11   Q.   And the transfer assignment, were you intending that
12  to be unilateral?
13   A.   I assumed those were negotiated issues.
14   Q.   Negotiated between who?
15   A.   Between the parties involved in the various
16  agreements.
17   Q.   Did you think they would discuss it with Eleutian?
18   A.   At the right time, I was -- assumed such, but not
19  knowing the protocols.
20   Q.   When you say "right time," what does that entail?
21   A.   This was a BYU-Hawaii problem. I assumed that at the
22  right time in their view they would broach the subject with
23  whomever they needed to broach the subject with.
24   Q.   Did you assume they would broach it with Eleutian?
25   A.   At some point, I assumed that would have to be done.

Page 155

1    Q.   Did you assume that that was going to be prior to the
2  transfer of the rights, transfer assign of the rights?
3    A.   I had no idea if that would be before or after,
4  not -- no knowledge of how that functioned.
5    Q.   But you understand and you have a knowledge of how
6  the termination was to be, is that correct, that you were
7  referring to here?
8    A.   That it would be discussed and bilateral.
9    Q.   Discussed with Eleutian?
10        MR. ORTON:  You have to answer audibly.
11   A.   At the right -- at the right time, yes, discussed
12  with Eleutian at some point.
13   Q.   (By Mr. Holiday)  And it's your testimony previously
14  that prior to this you aren't aware of CITO-LT attempting to
15  terminate the BYU-Hawaii/Eleutian agreement; is that correct?
16   A.   That's correct.
17        MR. ORTON:  "This" meaning this e-mail?
18        MR. HOLIDAY:  Yeah, that's right.
19   A.   That's correct.
20        MR. ORTON:  Dated May 4th, 2007.
21   Q.   (By Mr. Holiday)  You then go on to write, "Receiving
22  a change in direction from our leaders doesn't authorize us to
23  back out of legal agreements without appropriate resolution."
24  Which leaders gave you a change in direction?
25        MR. ORTON:  Objection, assumes facts not in evidence,

Page 156

1  no foundation, assumes facts.
2    A.   Standard operating procedure was for each of the
3  three primary members of the TOC to talk with their leaders,
4  mine being Steve Allen, Sandy Rogers being President
5  Samuelson, Keith Roberts being the president of BYU-Hawaii.
6         When CITO-LT approached the TOC with this with regard
7  and BYU-Hawaii said they were interested, we informed our
8  leaders. They said fine. Members of the TOC informed our
9  leaders, and they said fine.
10        And so receiving a change of direction from our
11  leaders, receiving that -- that response that says we can go a
12  different direction doesn't authorize us to back out of legal
13  agreements without appropriate resolution.
14   Q.   Have you looked over this e-mail in the last month?
15   A.   No.
16   Q.   And so is it -- I want to make sure I understand this
17  right. Is it your testimony that the change in direction was
18  just an approved change of direction?
19   A.   Yes.
20   Q.   So who proposed the change in direction?
21   A.   I believe I've stated this already, that Steve
22  Brandau and Larry Howick proposed to the TOC a change in
23  direction where they would take on the sublicensing
24  responsibilities. And that was then presented to BYU-Hawaii,
25  since they had the rights. And they said they would like to

Page 157

1  pursue that, and so checking with our leaders, received an
2  approval of that -- of that proposal to explore it, and so it
3  was explored.
4    Q.   So the change of direction wasn't something actively
5  being forced on the TALL Oversight Committee by the leaders?
6    A.   No, it was not.
7    Q.   But the leaders did direct the TALL Oversight
8  Committee to continue the transfer to Larry and Steve; is that
9  correct?
10        MR. ORTON:  Objection, assumes facts, no foundation.
11   A.   The -- the agreement -- if I can back up and state
12  this clearly, I'll be glad if I can do that.
13   Q.   Go ahead.
14   A.   The agreement was between BYU and BYU-Hawaii. The
15  TALL Oversight Committee was an advisory board. They brought
16  to the TALL -- they addressed the TALL Advisory Committee,
17  TALL Oversight Committee, "they," Larry Howick, Steve Brandau,
18  and proposed a reorganization of the licensing arrangements.
19        Individually, the vice president of BYU-Hawaii and
20  the vice president of BYU sought their leaders' counsel,
21  concurrence or direction, I don't know which it was, regarding
22  that.
23        I informed my leader, and he -- and he -- he
24  concurred that we could pursue -- this was a logical line of
25  action for BYU-Hawaii and BYU to pursue, and they chose to